Marvin J. Brauth, Esq.
WILENTZ, GOLDMAN & SPITZER P.A.
90 Woodbridge Center Drive
Post Office Box 10
Woodbridge, New Jersey  07095
732.636.8000
Attorneys for Plaintiff New Jersey
Coalition Of Automobile Retailers, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

-----------------------------------------------X

NEW JERSEY COALITION OF : 
AUTOMOTIVE RETAILERS, : Civil Action No. 3:18-cv-14563
INC., a non-profit New Jersey : (BRM)(TJB)
Corporation, :
 :
Plaintiff, : **STATEMENT OF UNDISPUTED**
 : **MATERIAL FACTS**
v. :
 :
MAZDA MOTOR OF AMERICA, :
INC., :
 :
Defendant. :

-----------------------------------------------X

Pursuant to Local Rule 56.1(a), Plaintiff New Jersey Coalition of

Automotive Retailers, Inc. ("NJ CAR") submits the following as its Statement of

Undisputed Material Facts in support of its motion for summary judgment against

defendant Mazda Motor of America, Inc. ("Mazda").

A.     **The Parties.**

1.     NJ CAR, a New Jersey not for profit corporation founded in 1918, is a trade association consisting of franchised new motor vehicle dealers in the State of New Jersey.  Certification of James B. Appleton in Opposition to Mazda's Motion to Dismiss dated November 30, 2018 ("Appleton Cert."), ¶2.

2.     There are currently sixteen franchised Mazda dealers in New Jersey, each of which is a member of NJ CAR and each of which is a "franchisee" as that term is defined in the New Jersey Franchise Practices Act (the "FPA").  Id., ¶6 & Exh. A; N.J.S.A. 56:10-3(c).

3.     NJ CAR serves the interests of its motor vehicle dealer members in several different ways: (1) it promotes the interests of franchised new car and truck retailers with governmental entities, the media and the public at large; (2) it provides its members with information on statutory, regulatory, and legislative matters affecting the interests of motor vehicle retailers; (3) it offers educational and training programs to employees of its members on best business practices, to enhance their professionalism and expertise and to promote compliance with law; and (4) it offers services to its members to enhance their businesses and that comply with legal requirements.  Appleton Cert., ¶3.

4.     In addition, NJ CAR also seeks to protect the interests of motor vehicle consumers by (1) providing them with comprehensive information related

2

#10300926.1

to their vehicle purchases; (2) promoting fair competition among its dealer members, (3) ensuring consumer access to multiple fairly competing dealerships throughout the State; (4) facilitating dialogue between consumers and dealerships in the event of a dispute; and (5) prioritizing the safety of drivers by ensuring that multiple dealerships can service their vehicle and address any safety recalls.  Id., ¶4.

5.      NJ CAR also actively represents New Jersey motor vehicle dealers in legislative and regulatory matters, (id., ¶5), and periodically participates as a party or as *amicus curiae* in litigation regarding the interests of its membership.  E.g., NJ CAR v. DaimlerChrysler Motors Corp., 107 F. Supp. 2d 495 (D.N.J. 1999); Bosland v. Warnock Dodge, Inc., 197 N.J. 543 (2009).

6.      In this case, NJ CAR appears as a plaintiff on behalf of its Mazda dealer members.  Appleton Cert., Exh. D.

7.      Defendant Mazda, a California corporation founded in 1970, markets motor vehicles for sale through dealers in the State of New Jersey and throughout the United States.  Appleton Cert., ¶¶7-8.

8.      Mazda's line of vehicles includes sedans, hatchbacks, crossovers, SUVs and sports cars.  Id., ¶8.

9.      Mazda is a "franchisor" as that term is defined in the FPA. N.J.S.A. 56:10-3(c).

**B.     The New Jersey Legislature Enacted The New Jersey Franchise Practices Act Nearly Fifty Years Ago To Protect Franchisees From Abusive Practices Of Franchisors.**

10.     In 1971, the New Jersey Legislature enacted the FPA to protect franchisees from franchisor abuses arising from the unequal bargaining power in the franchisor-franchisee relationship.  P.L. 1971 c.356; N.J.S.A. 56:10-2.

11.     In the Statement accompanying the original bill, Assembly Bill 2063 (1971), the Legislature explained the rationale for this critical legislation:

> New Jersey would do the same in this bill which, through the courts, would rule out arbitrary and capricious cancellation of franchises while preserving the right of franchisors to safeguard their interests through the application of clear and nondiscriminatory standards. The bill would protect the substantial investment tangible and intangible of both parties in the various franchises.  It would rule out economic coercion as a business tactic in this most sensitive field.
>
> The New Jersey Legislature has been asked many times in the past to deal on a piecemeal basis with various problems growing out of the franchise relationship.  This bill would provide a comprehensive statutory formula for resolving a wide range of questions growing out of the franchise relationship.

Westfield Ctr. Serv. v. Cities Serv. Oil Co., 158 N.J. Super. 455, 471 (Ch. Div.), supplemented, 162 N.J. Super. 114 (Ch. Div. 1978), aff'd and remanded, 172 N.J. Super. 196 (App. Div. 1980), aff'd, 86 N.J. 453 (1981).

12.     Shortly after the FPA was enacted, the New Jersey Supreme Court noted that the Legislature had "declared that distribution and sales through

4

franchise arrangements in New Jersey vitally affect the general economy of the State, the public interest and the public welfare." Shell Oil Co. v. Marinello, 63 N.J. 402, 409 (1973).

13.    The New Jersey Supreme Court pointed out that the Legislature was motivated to enact the FPA to mitigate the unfair leverage that a franchisor had over a franchised dealer. Ibid.

14.    The New Jersey Supreme Court recognized that, upon the establishment of a franchise, the franchisor possesses substantial leverage over the franchisee on account of the franchisee's investment in its franchise, including time expended, expenses incurred, and efforts exhausted to generate business and customer good will, which the franchisee risks losing in its entirety at the whim of the franchisor. The franchisor, on the other hand, incurs no such risk because it can easily replace the former franchisee at the location while continuing to reap the benefits of the former franchisee's efforts, time and money. Ibid.

15.    A decade after the FPA became law, the New Jersey Supreme Court again recognized that franchisees required protection from abusive conduct by franchisors as a result of their unequal bargaining power:

> Though economic advantages to both parties exist in the franchise relationship, disparity in the bargaining power of the parties has led to some unconscionable provisions in the agreements. Franchisors have drafted contracts permitting them to terminate or to refuse renewal of franchises at will or for a wide variety of reasons

5

> including failure to comply with unreasonable conditions. Some franchisors have terminated or refused to renew viable franchises, leaving franchisees with nothing in return for their investment.    Others have threatened franchisees with termination to coerce them to stay open at unreasonable hours, purchase supplies only from the franchisor and at excessive rates or unduly expand their facilities.

Westfield Ctr. Serv. v. Cities Serv. Oil Co., 86 N.J. 453, 461-62 (1981).

16.    In 1996, the New Jersey Supreme Court again observed:

> One of the fundamental assumptions of the Franchise Act, verified by the testimony before the Assembly Judiciary Committee, is that the bargaining power of parties    to    franchise    agreements    is    generally disproportionate.    That    assumption    finds    concrete expression in the provisions of the Franchise Act that prohibit franchisors from coercing franchisees to consent to various specified unreasonable conditions in the franchise agreement.

Kubis & Perszyk Assocs. v. Sun Microsystems, Inc., 146 N.J. 176, 194 (1996).

17.    The federal courts in New Jersey likewise recognize that the Legislature enacted the FPA to level the playing field between franchisees and franchisors and to prohibit franchisors from subjecting their franchisees to unreasonable and onerous requirements.    See, e.g., GMC v. New A.C. Chevrolet, Inc., 263 F.3d 296, 319 (3d Cir. 2001) ("[T]he NJFPA was enacted in large part to counteract the unequal bargaining power between franchisor and franchisee, which would allow a franchisor to leverage its bargaining strength so as to insert provisions in its private agreements with franchisees that would allow it to sever

6

the franchise relationship at will"); Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 923 F. Supp. 665, 668 (D.N.J. 1996) (stating that the FPA is a "remedial statute which is intended to equalize the disparity in bargaining power" between franchisors and franchisees).

**C.  Federal Statutes Reflect Similar Concerns And Policies As The FPA.**

18.     The Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221-1225 ("ADDCA"), which evidences the federal concern with franchisor abuse of franchisees in the motor vehicle sales industry, and the Robinson-Patman Act of 1936, 15 U.S.C. § 13(a) ("RPA"), which finds certain price differentials between purchasers to be contrary to the federal policy in favor of fair competition on a level playing field, address similar concerns and reflect many of the policies of the FPA.  15 U.S.C. §§ 1221-1225; 15 U.S.C. § 13(a).

19.     The RPA prohibits certain forms of manufacturer price discrimination:

> [i]t shall be unlawful for any person engaged in commerce, in the course of such commerce . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly . . . or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).

7

20.    Pursuant to the ADDCA, "an automobile dealer may bring suit against any automobile manufacturer engaged in commerce . . . and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer . . . ."  15 U.S.C. § 1222.

21.    The Third Circuit Court of Appeals has observed that the ADDCA, just like the FPA, is "a remedial statute enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices."   Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92-93 (3d Cir. 2000).

22.    The Third Circuit Court of Appeals further noted that the ADDCA serves as "a supplement to the national antitrust laws, passed to counter-balance the economic leverage a manufacturer has over its ostensibly independent dealers, and its "control over [its] product in what amounts to quasi-integration to the retail level of distribution."   Ibid.

8

**D.    The New Jersey Legislature Has Amended The New Jersey Franchise Practices Act On Several Occasions To Ensure That Motor Vehicle Franchisees Are Protected From Abusive Practices By Motor Vehicle Franchisors.**

23.    In 1989, the Legislature amended the FPA by enacting two new sections, N.J.S.A. 56:10-7.2 and -7.3. See P.L. 1989, c. 24, § 1, eff. Feb. 6, 1989 (West) (codified at N.J.S.A. 56:10-7.2).

24.    In N.J.S.A. 56:10-7.2, the Legislature enunciated its findings and declarations concerning and addressed the evolving nature and continuing abuses in the motor vehicle franchisor-franchisee relationship:

> This inequality of bargaining power enables motor vehicle franchisors to compel motor vehicle franchisees to execute franchises and related leases and agreements which contain terms and conditions that would not routinely be agreed to by the motor vehicle franchisees absent the compulsion and duress which arise out of the inequality of bargaining power. These terms and conditions are detrimental to the interests of the motor vehicle franchisees in that they require the motor vehicle franchisees to relinquish their rights which have been established by the "Franchise Practices Act" and supplemental legislation and other statutes and laws of this State.

Id.

25.    In N.J.S.A. 56:10-7.3, the Legislature included provisions barring motor vehicle franchisors from requiring motor vehicle franchisees to agree to certain terms and conditions in franchise agreements or in any leases or agreements ancillary or collateral to such franchises. N.J.S.A. 56:10-7.3(a)(1-3).

9

#10300926.1

26.     Ten years later, in 1999, the Legislature again amended the FPA by enacting a new section, N.J.S.A. 56:10-7.4, which prohibited additional improper activities by motor vehicle franchisors.  1999 NJ Sess. Law Serv. Ch. 45 (Senate 1093).

27.     Among a number of other provisions, the Legislature prohibited motor vehicle franchisors from imposing unreasonable performance standards or unreasonable facilities, financial, operating or other requirements upon a franchisee; from requiring franchisees to give unconditional releases in regard to any FPA claims that the franchisee may have against the franchisor in order to receive monies due them; and from denying franchisees full compensation for recall repairs that they perform.  See NJ S. Comm. State., S.B. 1093, 11/30/1998; N.J.S.A. 56:10-7.4.

28.     In 2011, the Legislature further amended the FPA to "[define] the relationship and responsibilities between motor vehicle franchisors and motor vehicle franchisees."  P.L. 2011 c. 66, § 2; N.J. Assem. Floor State., A.B. 3722, 1/20/2011.

29.     The Legislature explained that the amendments were necessary to modernize the FPA to address specific abuses of power that had recently arisen:

> Over the years, the "Franchise Practices Act" has been amended to keep pace with changing market conditions and to address new threats to the consumer and the public interest in the franchise system.  Recent developments in

10

the auto industry have highlighted the unequal bargaining position of dealers vis-a-vis manufacturers. Dozens of New Jersey new car dealerships and thousands of dealership jobs have been lost. New Jersey consumers and the economy have suffered as a result.

This bill is intended to protect New Jersey new car dealerships and their employees from further economic dislocation imposed by automakers. The bill is designed to level the playing field on which auto franchisees and auto franchisors do business, and to protect the consumer and the public interest in a strong and secure franchise system of responsible local businesses.

N.J. Assem. Comm. State., A.B. 3722, 1/20/2011.

30.    Among other things, the 2011 amendments "clarifie[d] and reinforce[d]" provisions of the FPA relating to:

- Unreasonable facilities, capital inventory requirements imposed on auto retailers by automakers;

- Manufacturer demands on dealers to sign side agreements or addenda, which force dealers to give up essential franchise rights;

- Unreasonable charge backs levied by manufacturers against dealers in connection with the exportation of motor vehicles, sales incentive or warranty audits; and

- Repurchase obligations on the part of an auto manufacturer in the case of a voluntary dealer termination, and a dealer's rights in the case of an involuntary termination, in the event of a sale or transfer of a franchise, and when a manufacturer seeks to establish or relocate a new or competing franchise in the dealers relevant market area.

Id.

#10300926.1

**E.**    **N.J.S.A. 56:10-7.4(h).**

31.    Among the 2011 amendments, the Legislature amended N.J.S.A. 56:10-7.4(h) to require that motor vehicle franchisors sell all comparably equipped motor vehicles to all dealers in New Jersey at the same price without differential in discount, allowance, credit or bonus.  P.L. 2011 c. 66, § 2.

32.    Specifically, the FPA prohibits franchisors "to fail or refuse to sell or offer to sell such motor vehicles to all motor vehicle franchisees *at the same price* for a comparably equipped motor vehicle, on the same terms, with *no differential* in discount, allowance, credit or bonus."    N.J.S.A. 56:10-7.4(h) (emphasis added).

**F.**    **N.J.S.A. 56:10-7.4(l).**

33.    At the same time, the Legislature amended N.J.S.A. 56:10-7.4 to proscribe actions by motor vehicle franchisors that compel franchisees to undertake financially unjustified facilities modifications or that punish or deny benefits to dealers that do not comply with such demands.  N.J. Assem. Comm. State., A.B. 3722, 1/20/11.

34.    Specifically, a motor vehicle franchisor violates the FPA when it seeks:

> *To require or attempt to require a motor vehicle franchisee to relocate his franchise or to implement any facility or operational modification or to take or withhold or threaten to take or withhold any action,*

12

> ***impose or threaten to impose any penalty, or deny or
> threaten to deny any benefit as a result of the failure or
> refusal of such motor vehicle franchisee to agree to any
> such relocation or modification, unless*** the motor
> vehicle franchisor can demonstrate that: (1) funds are
> generally available to the franchisee for the relocation or
> modification on reasonable terms; and (2) ***the motor
> vehicle franchisee will be able, in the ordinary course of
> business as conducted by such motor vehicle
> franchisee, to earn a reasonable return on his total
> investment in such facility or from such operational
> modification, and the full return of his total investment
> in such facility or from such operational modifications
> within 10 years***; or (3) the modification is required so
> that the motor vehicle franchisee can effectively sell and
> service a motor vehicle offered by the motor vehicle
> franchisor based on the specific technology of the motor
> vehicle.   This subsection shall not be construed as
> requiring a motor vehicle franchisor to guarantee that the
> return as provided in paragraph (2) of this subsection will
> be realized.

<u>N.J.S.A.</u> 56:10-7.4(l) (emphasis added).

**G.**   **<u>N.J.S.A. 56:10-7.4(j).</u>**

35.   The Legislature also amended <u>N.J.S.A.</u> 56:10-7.4 in 2011 to bar

franchisors from requiring their dealers to use their facilities exclusively for the

franchisor's brand even where the facility has ample space for multiple brands

(dualling).  P.L. 2011 c. 66, § 2.

36.   Specifically, the FPA prohibits a motor vehicle franchisor:

> To impose or attempt to impose any requirement,
> limitation or regulation on, or interfere or attempt ***to
> interfere with, the manner in which a motor vehicle
> franchisee utilizes the facilities*** at which a motor vehicle

13

franchise is operated, ***including, but not limited to, requirements, limitations or regulations as to the line makes of motor vehicles that may be sold or offered for sale at the facility, or to take or withhold or threaten to take or withhold any action, impose or threaten to impose any penalty, or deny or threaten to deny any benefit, as a result of the manner in which the motor vehicle franchisee utilizes his facilities***, except that the motor vehicle franchisor may require that the portion of the facilities allocated to or used for the motor vehicle franchise meets the motor vehicle franchisor's reasonable, written space and volume requirements as uniformly applied by the motor vehicle franchisor. The provisions of this subsection shall not apply if the motor vehicle franchisor and the motor vehicle franchisee voluntarily agree to the requirement and separate and valuable consideration therefor is paid.

N.J.S.A. 56:10-7.4(j) (emphasis added).

**H.    Mazda Implements A Brand Experience Program That Creates Price Differentials Through Discounts Or Bonuses And Denies Benefits To Mazda Dealers That Do Not Comply With Certain Facility Obligations.**

37.    In 2018, Mazda introduced the Mazda Brand Experience Program 2.0 ("MBEP") and began implementing it on July 3, 2018.  Appleton Cert., ¶9 & Exh. B.

38.    The MBEP establishes an elaborate two-tiered pricing regime that enables Mazda dealers to earn discounts or bonuses for each vehicle a dealer sells based on its compliance with certain conditions.  Id., ¶10 & Exh. B.

39.    The MBEP offers these tiered discounts or bonuses as a percentage of the Manufacturer's Suggested Retail Price ("MSRP") on a per

14

vehicle basis ranging from 6.5% to 0% depending on the degree of compliance with the MBEP. Id., ¶11 & Exh. B.

40.    Mazda is only guaranteeing payments under the MBEP for compliance therewith for a four-year period. Id., ¶21 & Exh. B.

41.    To qualify for any payments under the MBEP, a Mazda dealer must achieve several base qualifiers.  Those Mazda dealers that achieve all of the base qualifiers are eligible for two discounts. Id., ¶12 & Exh. B.

42.    One is a brand commitment element payment based on facilities and other requirements that provides up to a 4.5% discount. Id., ¶13 & Exh. B.

43.    Specifically, Mazda dealers that have an exclusive Mazda facility that incorporates all Mazda required image elements, satisfies other "base elements" and employs a Dedicated Exclusive General Manager are designated as Retail Evolution ("RE") dealers that qualify for the full 4.5% brand commitment element discount or bonus. Id., ¶14 & Exh. B.

44.    Mazda dealers that satisfy all of these facility elements but that do not employ a Dedicated Exclusive General Manager are designated as exclusive dealers that qualify for 2.8% of the 4.5% brand commitment element discount or bonus. Id., ¶15 & Exh. B.

45.    Mazda dealers that have an exclusive Mazda showroom that does not incorporate all Mazda required image elements are designated as

15

exclusive showroom dealers that only qualify for 1.0% of the 4.5% brand commitment element discount or bonus. Id., ¶16 & Exh. B.

46.    Mazda dealers that do not have an exclusive Mazda facility are designated as dual dealers that do not qualify for any portion of the 4.5% brand commitment element discount or bonus. Id., ¶17 & Exh. B.

47.    The MBEP also contains a customer experience element payment based on Mazda's calculation of "customer experience" at the dealership. It provides up to a 2.0% discount off MSRP. Id., ¶18 & Exh. B.

48.    Although RE dealers, exclusive dealers, exclusive showroom dealers and dual dealers all are eligible for this discount, only those Mazda dealers that meet the customer experience requirements each quarter receive the 2.0% customer experience element discount for that quarter. The others receive nothing. Id., ¶19 & Exh. B.

49.    In sum, Mazda dealers have the ***potential*** to earn the following discounts (but some dealers will receive less or no discount at all):

| Type of Mazda Dealer | MBEP Discount |
|---|---|
| RE Dealer | Up to 6.5% of MSRP per vehicle sold |
| Exclusive Dealer | Up to 4.8% of MSRP per vehicle sold |
| Exclusive Showroom Dealer | Up to 3.0% of MSRP per vehicle sold |
| Dual Dealer | Up to 2.0% of MSRP per vehicle sold |

Id., ¶20 & Exh. B.

16

50.   For comparison purposes, on a vehicle with an MSRP of $30,000, a 6.5% discount comes to $1,950 per vehicle giving such dealers a significant price advantage over dealers that receive lesser or no discounts. For example, the most an exclusive dealer can receive is $1,440; an exclusive showroom dealer $900 and a dual dealer $600. Dealers that do not qualify for the Customer Experience discount would receive $600 less. Id., ¶20 & Exh. B.

I.    **At Least Two Mazda Dealers Have Sustained And Continue To Sustain Harm Caused By The Implementation Of The MBEP.**

51.   Maxon Auto Enterprises d/b/a Maxon Mazda ("Maxon") is a Mazda dealer in Union, New Jersey and a member of NJ CAR. Certification of Michael J. Ciasulli in Opposition to Mazda's Motion to Dismiss dated November 30, 2018 ("Ciasulli Cert."), ¶¶2-3.

52.   Maxon is presently a dual dealer, and thus does not qualify for any portion of the 4.5% brand commitment element discount or bonus. Id., ¶6.

53.   As a result, Maxon has already lost out on thousands of dollars in discount or bonus payments and on the opportunity to compete for sales with qualifying dealers by lowering prices based on receipt of those discounts or bonuses. Id., ¶7.

54.   In order to construct an exclusive Mazda facility and qualify for at least a portion of the 4.5% brand commitment element discount or bonus, Maxon would need to first acquire property to satisfy Mazda's acreage requirement

17

(which it may not even be able to buy) and then undertake the construction of a much larger facility. Id., ¶8.

55.   Maxon would need to spend approximately $12-14 million to take these extraordinary actions, monies that simply are not available to Maxon at this time. Id., ¶9.

56.   Additionally, Maxon would not make a reasonable return on such an investment by taking such action because it would not generate profits from additional sales and recoup discounts or bonuses in an amount even approaching $12-14 million during the four-year period during which these discounts or bonuses are guaranteed. Id., ¶10.

57.   Mazda never provided Maxon with any justification for making modifications necessary to qualify for any portion of the 4.5% brand commitment element discount or bonus. Id., ¶11.

58.   SIL, LLC d/b/a Irwin Mazda ("Irwin") is a Mazda dealer in Freehold Township, New Jersey and a member of NJ CAR.  Certification of Shelly Irwin LoCascio in Opposition to Mazda's Motion to Dismiss dated December 3, 2018 ("LoCascio Cert."), ¶¶2-3.

59.   Irwin is presently an exclusive showroom dealer that only qualifies for 1.0% of the 4.5% brand commitment element discount or bonus, and has already lost out on thousands of dollars in discount or bonus payments and on

18

the opportunity to compete for sales with qualifying dealers by lowering prices based on receipt of those discounts or bonuses.  Id., ¶¶5-6.

60.    In order to qualify for a greater portion of the 4.5% brand commitment element discount or bonus, Irwin would need to completely remove the existing facade of its facility and replace it with different materials, and entirely renovate the interior of the facility to comply with Mazda's "jewel case" design. Id., ¶7.

61.    Irwin cannot renovate the interior of its facility into a "jewel case" design because Freehold will not permit it.  Id., ¶9.

62.    Consequently, Irwin will never be eligible for any percentage beyond 1.0% of the 4.5% brand commitment element discount or bonus under the MBEP.  Id., ¶10.

63.    Even if Irwin could comply with all of the MBEP requirements, Irwin would not make a reasonable return on such an investment by taking such action because it would not generate profits from additional sales and recoup discounts or bonuses in an amount nearing the amounts needed to have the renovations made during the four-year period during which these discounts or bonuses are guaranteed.  Id., ¶11.

19

#10300926.1

64.     Mazda never provided Irwin with any justification for making the modifications necessary to qualify for any larger portion of the 4.5% brand commitment element discount or bonus.  Id., ¶12.

**J.      NJ CAR Files The Present Action Alleging That The Mazda Brand Experience Program Violates The Franchise Practices Act.**

65.     On October 2, 2018, NJ CAR filed this lawsuit seeking a declaratory judgment that the MBEP violates the FPA on its face, and that Mazda's implementation of the MBEP in New Jersey is thus unlawful.  NJ CAR also seeks an injunction restraining Mazda from continuing to apply the MBEP in New Jersey.  Id., Exh. D.

66.     In this lawsuit, NJ CAR contends that the MBEP violates the three provisions of the FPA quoted above:

- The MBEP's provision of per-vehicle discounts to Mazda dealers based on their level of achievement of certain criteria creates vehicle price differentials up to 6.5% of the MSRP per vehicle among dealers in violation of N.J.S.A. 56:10-7.4(h);

- The MBEP's denial of a benefit (i.e., a per-vehicle discount or bonus) to Mazda dealers that do not provide or construct an exclusive, image-compliant facility, notwithstanding Mazda's failure to even attempt to demonstrate in the MBEP that the costs of such facilities can be justified by Mazda dealers, or to offer exemptions to dealers who cannot reasonably comply, violates N.J.S.A. 56:10-7.4(l); and

- The MBEP's denial of a benefit (i.e., a per-vehicle discount or bonus) to Mazda dealers that do not provide or construct an exclusive facility but rather use their facilities for multiple brands (dual) violates <u>N.J.S.A.</u> 56:10-7.4(j).

<u>Id.</u>, Exh. D at ¶28.

Respectfully submitted,

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Plaintiff, New Jersey Coalition
of Automobile Retailers, Inc.

By: /s/ MARVIN J. BRAUTH
　　　MARVIN J. BRAUTH

Dated: December 14, 2018

21