Daniel J. Kluska, Esq.
WILENTZ, GOLDMAN & SPITZER P.A.
90 Woodbridge Center Drive
Post Office Box 10
Woodbridge, New Jersey  07095
732.636.8000
Attorneys for Plaintiff New Jersey
Coalition Of Automobile Retailers, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

------------------------------------------------X
NEW JERSEY COALITION OF            :
AUTOMOTIVE RETAILERS,              :    Civil Action No. 3:18-cv-14563
INC., a non-profit New Jersey      :           (BRM)(TJB)
Corporation,                       :
                                   :
           Plaintiff,              :    **STATEMENT OF UNDISPUTED**
                                   :         **MATERIAL FACTS**
v.                                 :
                                   :
MAZDA MOTOR OF AMERICA,            :
INC.,                              :
                                   :
           Defendant.              :
------------------------------------------------X

Pursuant to Local Rule 56.1(a), Plaintiff New Jersey Coalition of Automobile Retailers, Inc. ("NJ CAR") submits the following as its Statement of Undisputed Material Facts in support of its motion for summary judgment against defendant Mazda Motor of America, Inc. ("Mazda").

#11982548.1

### A. **The Parties.**

1. NJ CAR, a New Jersey not for profit corporation founded in 1918, is a trade association consisting of franchised new motor vehicle dealers in the State of New Jersey. Certification of James B. Appleton dated November 30, 2018 ("Appleton Cert."), ¶2 (Docket Entry No. 12-3).

2. There are approximately 500 members of NJ CAR, sixteen of which are Mazda franchised dealers in New Jersey, and each of which is a "franchisee" as that term is defined in the New Jersey Franchise Practices Act (the "FPA"). Id., ¶6 & Exh. A; N.J.S.A. 56:10-3(c).

3. NJ CAR serves the interests of its motor vehicle dealer members in several different ways: (1) it promotes the interests of franchised new car and truck retailers with governmental entities, the media and the public at large; (2) it provides its members with information on statutory, regulatory, and legislative matters affecting the interests of motor vehicle retailers; (3) it offers educational and training programs to employees of its members on best business practices, to enhance their professionalism and expertise and to promote compliance with law; and (4) it offers services to its members to enhance their businesses and that comply with legal requirements. Appleton Cert., ¶3.

4. In addition, NJ CAR also seeks to protect the interests of motor vehicle consumers by (1) providing them with comprehensive information related

to their vehicle purchases; (2) promoting fair competition among its dealer members, (3) ensuring consumer access to multiple fairly competing dealerships throughout the State; (4) facilitating dialogue between consumers and dealerships in the event of a dispute; and (5) prioritizing the safety of drivers by ensuring that multiple dealerships can service their vehicle and address any safety recalls. Id., ¶4.

5.  NJ CAR also actively represents New Jersey motor vehicle dealers in legislative and regulatory matters, (id., ¶5), and periodically participates as a party or as *amicus curiae* in litigation in state and federal court regarding the interests of its membership.  E.g., NJ CAR v. DaimlerChrysler Motors Corp., 107 F. Supp. 2d 495 (D.N.J. 1999); NJ CAR v. Ford Motor Co. d/b/a Lincoln Motor Co., Docket No. MER-L-234-20 (Law Div. 2020); Goffe v. Foulke Mgmt. Corp., 238 N.J. 191 (2019); Duke v. All Am. Ford, Inc., 2018 WL 3596274 (App. Div. 2018); In re New Jersey State Contract A71188, 422 N.J. Super. 275 (App. Div. 2011); Bosland v. Warnock Dodge, Inc., 197 N.J. 543 (2009); Gross v. TJH Auto. Co., 380 N.J. Super. 176 (App. Div. 2005); General Motors Acceptance Corp. v. Cahill, 375 N.J. Super. 553 (App. Div. 2005).

6.  Defendant, Mazda, a California corporation founded in 1970, manufactures and markets motor vehicles for sale through dealers in the State of New Jersey and throughout the United States.  Appleton Cert., ¶¶7-8.

7. Mazda's line of vehicles includes sedans, hatchbacks, crossovers, SUVs and sports cars. Id., ¶8.

8. Mazda is a "franchisor" as that term is defined in the FPA. N.J.S.A. 56:10-3(c).

**B. The New Jersey Legislature Enacted The New Jersey Franchise Practices Act Nearly Fifty Years Ago To Protect Franchisees From Abusive Practices Of Franchisors.**

9. In 1971, the New Jersey Legislature enacted the FPA to protect franchisees from franchisor abuses arising from the unequal bargaining power in the franchisor-franchisee relationship. P.L. 1971 c.356; N.J.S.A. 56:10-2.

10. In the Statement accompanying the original bill, Assembly Bill 2063 (1971), the Legislature explained the rationale for this critical legislation:

> New Jersey would do the same in this bill which, through the courts, would rule out arbitrary and capricious cancellation of franchises while preserving the right of franchisors to safeguard their interests through the application of clear and nondiscriminatory standards. The bill would protect the substantial investment tangible and intangible of both parties in the various franchises. It would rule out economic coercion as a business tactic in this most sensitive field.
>
> The New Jersey Legislature has been asked many times in the past to deal on a piecemeal basis with various problems growing out of the franchise relationship. This bill would provide a comprehensive statutory formula for resolving a wide range of questions growing out of the franchise relationship.

4

Westfield Ctr. Serv. v. Cities Serv. Oil Co., 158 N.J. Super. 455, 471 (Ch. Div.), supplemented, 162 N.J. Super. 114 (Ch. Div. 1978), aff'd and remanded, 172 N.J. Super. 196 (App. Div. 1980), aff'd, 86 N.J. 453 (1981).

11. Shortly after the Legislature enacted the FPA, the New Jersey Supreme Court stated that the Legislature had "declared that distribution and sales through franchise arrangements in New Jersey vitally affect the general economy of the State, the public interest and the public welfare."  Shell Oil Co. v. Marinello, 63 N.J. 402, 409 (1973).

12. The New Jersey Supreme Court pointed out that the Legislature was motivated to enact the FPA to mitigate the unfair leverage that a franchisor had over a franchised dealer.  Id.

13. The New Jersey Supreme Court recognized that, upon the establishment of a franchise, the franchisor possesses substantial leverage over the franchisee on account of the franchisee's investment in its franchise, including time expended, expenses incurred, and efforts exhausted to generate business and customer good will, which the franchisee risks losing in its entirety at the whim of the franchisor.  The franchisor, on the other hand, incurs no such risk because it can easily replace the former franchisee at the location while continuing to reap the benefits of the former franchisee's efforts, time and money.  Id.

5

#11982548.1

14. A decade after the FPA became law, the New Jersey Supreme Court again recognized that franchisees required protection from abusive conduct by franchisors exploiting their unequal bargaining power:

> Though economic advantages to both parties exist in the franchise relationship, disparity in the bargaining power of the parties has led to some unconscionable provisions in the agreements. Franchisors have drafted contracts permitting them to terminate or to refuse renewal of franchises at will or for a wide variety of reasons including failure to comply with unreasonable conditions. Some franchisors have terminated or refused to renew viable franchises, leaving franchisees with nothing in return for their investment. Others have threatened franchisees with termination to coerce them to stay open at unreasonable hours, purchase supplies only from the franchisor and at excessive rates or unduly expand their facilities.

Westfield Ctr. Serv. v. Cities Serv. Oil Co., 86 N.J. 453, 461-62 (1981).

15. In 1996, the New Jersey Supreme Court reiterated that "the Act's legislative history as well as our common experience suggests that the financial resources of most franchisees pale by comparison to the financial strength and profitability of their franchisors." Kubis & Perszyk Assocs. v. Sun Microsystems, Inc., 146 N.J. 176, 193 (1996).

16. The New Jersey Supreme Court again recognized the unequal bargaining power between franchisees and franchisors:

> One of the fundamental assumptions of the Franchise Act, verified by the testimony before the Assembly Judiciary Committee, is that the bargaining power of

>parties to franchise agreements is generally disproportionate. That assumption finds concrete expression in the provisions of the Franchise Act that prohibit franchisors from coercing franchisees to consent to various specified unreasonable conditions in the franchise agreement.

Id. at 194.

17. The Third Circuit Court of Appeals stated that "the NJFPA was enacted in large part to counteract the unequal bargaining power between franchisor and franchisee, which would allow a franchisor to leverage its bargaining strength so as to insert provisions in its private agreements with franchisees that would allow it to sever the franchise relationship at will." GMC v. New A.C. Chevrolet, Inc., 263 F.3d 296, 319 (3d Cir. 2001).

18. The Third Circuit Court of Appeals recognized that "New Jersey courts have held that the NJFPA is a remedial statute intended to equalize the disparity in bargaining power in franchisor-franchisee relations." Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 134 F.3d 557, 566 (3d Cir. 1998).

19. This Court asserted that the "very reason the [FPA] was enacted [was] to protect franchisees, possessed of less bargaining power than their franchisors, from such daunting 'choices.'" Beilowitz v. General Motors Corp., 233 F. Supp. 2d 631, 633 (D.N.J. 2002).

#11982548.1

  **C. The New Jersey Legislature Amended The New Jersey Franchise Practices Act In 1989 And 1999 To Ensure That Motor Vehicle Franchisees Are Protected From Abusive Practices By Motor Vehicle Franchisors.**

  20. In 1989, the Legislature amended the FPA by enacting two new sections, N.J.S.A. 56:10-7.2 and -7.3.  N.J.S.A. 56:10-7.2, -7.3.

  21. In N.J.S.A. 56:10-7.2, the Legislature addressed and enunciated its findings and declarations concerning the evolving nature and continuing abuses in the motor vehicle franchisor-franchisee relationship:

> This inequality of bargaining power enables motor vehicle franchisors to compel motor vehicle franchisees to execute franchises and related leases and agreements which contain terms and conditions that would not routinely be agreed to by the motor vehicle franchisees absent the compulsion and duress which arise out of the inequality of bargaining power. These terms and conditions are detrimental to the interests of the motor vehicle franchisees in that they require the motor vehicle franchisees to relinquish their rights which have been established by the "Franchise Practices Act" and supplemental legislation and other statutes and laws of this State.

See P.L. 1989, c. 24, § 1, eff. Feb. 6, 1989 (West) (codified at N.J.S.A. 56:10-7.2).

  22. In N.J.S.A. 56:10-7.3, the Legislature included provisions barring motor vehicle franchisors from requiring motor vehicle franchisees to agree to certain terms and conditions in franchise agreements or in any leases or agreements ancillary or collateral to such franchises.  N.J.S.A. 56:10-7.3(a)(1-3).

8

#11982548.1

23. Ten years later, in 1999, the Legislature again amended the FPA by enacting a new section, N.J.S.A. 56:10-7.4, which prohibited additional improper activities by motor vehicle franchisors. 1999 NJ Sess. Law Serv. Ch. 45 (Senate 1093).

24. Among a number of other provisions, the Legislature prohibited motor vehicle franchisors from imposing unreasonable performance standards or unreasonable facilities, financial, operating or other requirements upon a franchisee; from requiring franchisees to give unconditional releases in regard to any FPA claims that the franchisee may have against the franchisor in order to receive monies due them; and from denying franchisees full compensation for recall repairs that they perform. See NJ S. Comm. State., S.B. 1093, 11/30/1998; N.J.S.A. 56:10-7.4.

D. **The New Jersey Legislature Again Amended The New Jersey Franchise Practices Act In 2011 To "Level The Playing Field" For Motor Vehicle Franchisees Doing Business With Motor Vehicle Franchisors.**

25. In 2011, the Legislature again amended the FPA to "[define] the relationship and responsibilities between motor vehicle franchisors and motor vehicle franchisees." P.L. 2011 c. 66, § 2; N.J. Assem. Floor State., A.B. 3722, 1/20/2011.

26. The Legislature explained that the amendments were necessary to modernize the FPA to address specific abuses of power that had recently arisen:

9

> Over the years, the "Franchise Practices Act" has been amended to keep pace with changing market conditions and to address new threats to the consumer and the public interest in the franchise system. Recent developments in the auto industry have highlighted the unequal bargaining position of dealers vis-a-vis manufacturers. Dozens of New Jersey new car dealerships and thousands of dealership jobs have been lost. New Jersey consumers and the economy have suffered as a result.
>
> This bill is intended to protect New Jersey new car dealerships and their employees from further economic dislocation imposed by automakers. The bill is designed to level the playing field on which auto franchisees and auto franchisors do business, and to protect the consumer and the public interest in a strong and secure franchise system of responsible local businesses.

N.J. Assem. Comm. State., A.B. 3722, 1/20/2011.

27. Among other things, the 2011 amendments "clarifie[d] and reinforce[d]" provisions of the FPA relating to:

- Unreasonable facilities, capital or inventory requirements imposed on auto retailers by automakers;

- Manufacturer demands on dealers to sign side agreements or addenda, which force dealers to give up essential franchise rights;

- Unreasonable charge backs levied by manufacturers against dealers in connection with the exportation of motor vehicles, sales incentive or warranty audits; and

- Repurchase obligations on the part of an auto manufacturer in the case of a voluntary dealer termination, and a dealer's rights in the case of an involuntary termination, in the event of a sale or transfer of a franchise, and when a manufacturer seeks to establish or relocate a new or competing franchise in the dealer's relevant market area. Id.

10

#11982548.1

1. **N.J.S.A. 56:10-7.4(h).**

28. Among the 2011 amendments, the Legislature amended N.J.S.A. 56:10-7.4 to require that motor vehicle franchisors sell, or offer to sell, all comparably equipped motor vehicles to all dealers in New Jersey at the same price without differential in discount, allowance, credit or bonus. P.L. 2011 c. 66, § 2.

29. Specifically, the FPA prohibits franchisors "to fail or refuse to sell or offer to sell such motor vehicles to all motor vehicle franchisees at the same price for a comparably equipped motor vehicle, on the same terms, with no differential in discount, allowance, credit or bonus." N.J.S.A. 56:10-7.4(h).

2. **N.J.S.A. 56:10-7.4(l).**

30. At the same time, the Legislature amended N.J.S.A. 56:10-7.4 to proscribe actions by motor vehicle franchisors that compel franchisees to undertake financially unjustified facilities modifications or that punish or deny benefits to dealers that do not comply with such demands. N.J. Assem. Comm. State., A.B. 3722, 1/20/11.

31. Specifically, a motor vehicle franchisor violates the FPA when it seeks:

> *To require or attempt to require a motor vehicle franchisee to relocate his franchise or to implement any facility or operational modification or to take or withhold or threaten to take or withhold any action, impose or threaten to impose any penalty, or deny or threaten to deny any benefit as a result of the failure or*

11

#11982548.1

> *refusal of such motor vehicle franchisee to agree to any such relocation or modification, unless* the motor vehicle franchisor can demonstrate that: (1) funds are generally available to the franchisee for the relocation or modification on reasonable terms; and (2) *the motor vehicle franchisee will be able, in the ordinary course of business as conducted by such motor vehicle franchisee, to earn a reasonable return on his total investment in such facility or from such operational modification, and the full return of his total investment in such facility or from such operational modifications within 10 years*; or (3) the modification is required so that the motor vehicle franchisee can effectively sell and service a motor vehicle offered by the motor vehicle franchisor based on the specific technology of the motor vehicle. This subsection shall not be construed as requiring a motor vehicle franchisor to guarantee that the return as provided in paragraph (2) of this subsection will be realized.

N.J.S.A. 56:10-7.4(l) (emphasis added).

### 3. **N.J.S.A. 56:10-7.4(j).**

32. The Legislature also amended N.J.S.A. 56:10-7.4 in 2011 to bar franchisors from requiring their dealers to use their facilities exclusively for the franchisor's brand even where the facility has ample space for multiple brands (dualling). P.L. 2011 c. 66, § 2.

33. Specifically, the FPA prohibits a motor vehicle franchisor:

> To impose or attempt to impose any requirement, limitation or regulation on, or interfere or attempt *to interfere with, the manner in which a motor vehicle franchisee utilizes the facilities* at which a motor vehicle franchise is operated, *including, but not limited to, requirements, limitations or regulations as to the line*

12

#11982548.1

> *makes of motor vehicles that may be sold or offered for sale at the facility, or to take or withhold or threaten to take or withhold any action, impose or threaten to impose any penalty, or deny or threaten to deny any benefit, as a result of the manner in which the motor vehicle franchisee utilizes his facilities*, except that the motor vehicle franchisor may require that the portion of the facilities allocated to or used for the motor vehicle franchise meets the motor vehicle franchisor's reasonable, written space and volume requirements as uniformly applied by the motor vehicle franchisor. The provisions of this subsection shall not apply if the motor vehicle franchisor and the motor vehicle franchisee voluntarily agree to the requirement and separate and valuable consideration therefor is paid.

N.J.S.A. 56:10-7.4(j) (emphasis added).

### E. Mazda Implements A Brand Experience Program That Creates Price Differentials Through Discounts Or Bonuses And Denies Benefits To Mazda Dealers That Do Not Comply With Certain Facility Obligations.

34. In 2018, Mazda introduced the Mazda Brand Experience Program 2.0 ("MBEP") and began implementing it on July 3, 2018. Appleton Cert., ¶9 & Exh. B.

35. The MBEP establishes an elaborate two-tiered pricing regime that enables Mazda dealers to earn discounts or bonuses for each vehicle a dealer sells based on its compliance with certain conditions. Id., ¶10 & Exh. B.

36. The MBEP offers these tiered discounts or bonuses as a percentage of the Manufacturer's Suggested Retail Price ("MSRP") on a per

13

#11982548.1

vehicle basis ranging from 6.5% to 0% depending on the degree of compliance with the MBEP.  Id., ¶11 & Exh. B.

37. Mazda is only guaranteeing payments under the MBEP for compliance therewith for a four-year period.  Id., ¶21 & Exh. B.

38. To qualify for any payments under the MBEP, a Mazda dealer must achieve several base qualifiers.  Those Mazda dealers that achieve all of the base qualifiers are eligible for two discounts.  Id., ¶12 & Exh. B.

39. One is a brand commitment element payment based on facilities and other requirements that provides up to a 4.5% discount.  Id., ¶13 & Exh. B.

40. Specifically, Mazda dealers that enroll in a Retail Evolution Program, have an exclusive Mazda facility that incorporates all Mazda required image elements, satisfy other "base elements" and employ a Dedicated Exclusive General Manager may be designated as Retail Evolution ("RE") dealers that qualify for the full 4.5% brand commitment element discount or bonus.  Id., ¶14 & Exh. B.

41. Mazda dealers that satisfy all of these facility elements but that do not employ a Dedicated Exclusive General Manager are disqualified from being designated RE dealers and instead may be designated as exclusive dealers that qualify for 2.8% of the 4.5% brand commitment element discount or bonus.  Id., ¶15 & Exh. B.

42. Mazda dealers that have an exclusive Mazda showroom that does not incorporate all Mazda required image elements, and which also meet other base criteria, are designated as exclusive showroom dealers that only qualify for 1.0% of the 4.5% brand commitment element discount or bonus. Id., ¶16 & Exh. B.

43. Mazda dealers that do not have an exclusive Mazda facility are designated as dual dealers that do not qualify for any portion of the 4.5% brand commitment element discount or bonus. Id., ¶17 & Exh. B.

44. The MBEP also contains a customer experience element payment based on Mazda's calculation of "customer experience" at the dealership. It provides up to a 2.0% discount off MSRP. Id., ¶18 & Exh. B.

45. Although RE dealers, exclusive dealers, exclusive showroom dealers and dual dealers all are eligible for this discount, only those Mazda dealers that meet the customer experience requirements each quarter receive the 2.0% customer experience element discount for that quarter. The others receive nothing. Id., ¶19 & Exh. B.

46. In sum, Mazda dealers have the *potential* to earn the following discounts (but some dealers will receive less or no discount at all):

| Type of Mazda Dealer | MBEP Discount |
|---|---|
| RE Dealer | Up to 6.5% of MSRP per vehicle sold |
| Exclusive Dealer | Up to 4.8% of MSRP per vehicle sold |
| Exclusive Showroom Dealer | Up to 3.0% of MSRP per vehicle sold |
| Dual Dealer | Up to 2.0% of MSRP per vehicle sold |

Id., ¶20 & Exh. B.

47. For comparison purposes, on a vehicle with an MSRP of $30,000, a 6.5% discount comes to $1,950 per vehicle giving such dealers a significant price advantage over dealers that receive lesser or no discounts. For example, the most an exclusive dealer can receive is $1,440; an exclusive showroom dealer $900 and a dual dealer $600. Dealers that do not qualify for the Customer Experience discount would receive $600 less. Id., ¶20 & Exh. B.

**F.   Mazda Acknowledged That Many Of Its Dealers Did Not Satisfy All Criteria To Qualify For The Full Discount And Thus Sustained Harm Caused By The Implementation Of The MBEP.**

48. Months after Mazda implemented the MBEP, Mazda acknowledged that only three of the sixteen Mazda dealers qualified for and could earn the full 4.5% brand commitment element discount. Declaration of Kyle Kaczmarek dated November 8, 2018, ¶9 (Docket Entry No. 7-1).[1]

---

[1] Mazda re-filed this Declaration two years later on July 30, 2020 in connection with its second motion to dismiss. See Docket Entry 36-1.

#11982548.1

49. Mazda stated that eight other dealers enrolled in the MBEP but had not completed their facilities and thus did not receive the full discount on vehicles. Id., ¶10.

50. Mazda thereby also tacitly conceded that five Mazda dealers of NJ CAR did not qualify for any of the facilities portion of the MBEP. Id., ¶¶9-10.

51. In total, thirteen of the sixteen dealers were not, at least initially, receiving the full brand commitment element discount that Mazda is providing under the MBEP. Id., ¶¶9-10.

52. With respect to two of the dealers, Maxon Auto Enterprises d/b/a Maxon Mazda ("Maxon") is a Mazda dealer in Union, New Jersey and a member of NJ CAR, and SIL, LLC d/b/a Irwin Mazda ("Irwin") is a Mazda dealer in Freehold Township, New Jersey and a member of NJ CAR. Certification of Michael J. Ciasulli dated November 30, 2018, ¶¶2-3 (Docket Entry 12-2); Certification of Shelly Irwin LoCascio dated December 3, 2018, ¶¶2-3 (Docket Entry 12-1).

53. Mazda has acknowledged that Maxon is a dualled dealership that does not qualify for any portion of the brand commitment element discount and that Irwin is an exclusive showroom dealer that only qualifies for 1.0% of the 4.5% brand commitment element discount. Mazda's Response to Plaintiff's Statement of Undisputed Material Facts, ¶¶ 52, 59 (Docket Entry 25-1).

54. Mazda further admitted that it did not provide Maxon or Irwin with any justification for making modifications necessary to qualify for any portion of the 4.5% brand commitment element discount, and even asserted that it has no obligation to do so.  Id., ¶¶ 57, 64.

55. Mazda further acknowledged that not all Mazda dealers were receiving the 2.0% customer experience element discount.  Mazda stated that there were three Mazda dealers that did not receive the 2.0% customer experience element discount in at least the first several months of the MBEP.  Reply Declaration of Kyle Kaczmarek dated December 17, 2018, ¶¶2-3 (Docket Entry No. 18).

          Respectfully submitted,

          WILENTZ, GOLDMAN & SPITZER, P.A.
          Attorneys for Plaintiff, New Jersey Coalition
          of Automobile Retailers, Inc.

          By:   */s/ Daniel J. Kluska*
                 DANIEL J. KLUSKA

Dated: February 3, 2021